IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIRECT STEEL, LLC, | ) | |
| | ) | |
| *Petitioner*, | ) | No. 24 C 1239 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| MID-CONTINENT CASUALTY CO., OKLAHOMA SURETY, and TRI-C CIVIL CONSTRUCTION, LLC, | ) ) ) | |
| | ) | |
| *Respondents*. | ) | |

## MEMORANDUM OPINION AND ORDER

On February 13, 2024, Petitioner Direct Steel, LLC, filed a petition to confirm in part and vacate in part an arbitration award issued on December 12, 2023. (Dkt. 1). On April 17, 2024, the Court confirmed the portion of the arbitration award as to Tri-C Civil Construction, LLC. (Dkt. 31). For the reasons set forth below, the Court denies the petition to vacate in part the portion of the award as to Oklahoma Surety Company and Mid-Continent Casualty Company. [1]

### BACKGROUND

This dispute arises from a construction project managed by the U.S. Army Corps of Engineers in Fort Hood, Texas. (Dkt. 1 ¶ 2). The project is known as the Supply Support Activity Warehouse Project ("the Project"). (*Id.*) Petitioner Direct Steel, LLC, the general contractor for the Project, entered into three subcontracts with Tri-C Civil Construction, LLC in February 2021. (*Id.* at ¶¶ 16–17). First, the Interior Concrete Subcontract required Tri-C to construct the building slab. (*Id.* at ¶ 17; Dkt. 29 at 2). Next, the Earthwork Subcontract required Tri-C to provide, in part, the labor and materials for the "demolition, earthwork, temporary erosion, and sediment control." (Dkt. 1 ¶ 17; Dkt. 29 at 2). Lastly, the Paving Subcontract—the subject of this proceeding— required Tri-C to install all site concrete and asphalt paving on the Project. (Dkt. 1 ¶ 18). Tri-C

needed to obtain a performance bond under all three subcontracts. (Dkt. 1-2 ¶ 13.1; Dkt. 29 at 3). Nearly ten months after entering into the Paving Subcontract, Tri-C obtained a $1,867,768.79 performance bond (the "Performance Bond") from Mid-Continent Casualty Company and Oklahoma Surety Company (collectively the "Surety"). (Dkt. 1 ¶ 20; Dkt. 1-4 at 62). The Performance Bond pertained solely to the Paving Subcontract and required the Surety to "faithfully and promptly" perform Tri-C's obligations under the Paving Subcontract. (Dkt. 1 ¶ 21). Further, the Performance Bond incorporated by reference the Paving Subcontract. (*Id.* at ¶ 59).

After failing to timely prepare and submit its required shop drawings, order equipment and supplies, or commence work by January 2022, Tri-C ultimately defaulted on the Paving Subcontract. (*Id.* at ¶¶ 22–23; *see* Dkt. 1-2 ¶ 8.1). Tri-C failed to cure the outlined defaults, and in March 2022, Direct Steel sent Tri-C a notice of termination due to material breach of the Paving Subcontract. (Dkt. 1 ¶ 28; *see* Dkt. 1-2 ¶ 8.2). Direct Steel subsequently hired Lone Star Grading & Materials to complete the Paving Subcontract work at a substantially higher price. (Dkt. 1 ¶ 31). Direct Steel also notified the Surety of Tri-C's default. (*Id.* at ¶ 29). In its termination letter to Tri-C, Direct Steel identified contract breaches occurring from August 2021 through February 2022. (Dkt. 29 at 3). The Surety denied Direct Steel's claim as they believed Tri-C was not in material default of the Paving Subcontract since the work had not yet commenced, the alleged defaults were known to Direct Steel prior to the Performance Bond's issuance, and the alleged defaults—relating to the other two subcontracts—occurred prior to the Performance Bond's issuance. (*See* Dkt. 1-7 at 16–17).

When the Surety denied Direct Steel's Performance Bond claim, Direct Steel filed for arbitration against Tri-C and the Surety with the American Arbitration Association pursuant to the

2

Paving Subcontract's broad arbitration clause.[1] (Dkt. 1 ¶ 32; Dkt. 1-4; Dkt. 29 at 2–4). The issues before Arbitrator Paulo Flores were whether Tri-C defaulted on the Paving Subcontract, and if so, whether those defaults occurred before the Performance Bond was issued. (Dkt. 1 ¶ 44). The Surety brought affirmative defenses and counter claims.[2] (*Id.* at ¶ 36; Dkt. 29 at 4–5).

On December 12, 2023, the Arbitrator issued an arbitration award, finding that Tri-C materially breached the Paving Contract and awarding Direct Steel its cost to complete the work with Lone Star Grading & Materials, plus other fees and costs. (Dkt. 1 ¶ 40; Dkt. 1-1 at 4–7). Further, the Arbitrator found that the Surety's denial of Direct Steel's claim under the Performance Bond was correct. (Dkt. 1-1 ¶ 15). He found it appropriate as (1) Direct Steel and Tri-C did not accurately represent the status of the Project in order to attain the November 2021 Performance Bond; (2) Tri-C had not performed any work under the Paving Subcontract at the time of their termination; and (3) Tri-C's defaults on the Earthwork and Interior Concrete Subcontracts–which were not bonded by the Surety and occurred before the Performance Bond—impacted the Paving Subcontract. (*Id.*)

With respect to the issuance of the Performance Bond, the Arbitrator found that an October 8, 2021 "All is Right Letter" regarding the status of the project was "simply irreconcilable" with the actual status of the Project, such that "it is almost inconceivable" the Surety would have issued the Performance Bond. (*Id.* at ¶ 15A). Additionally, the Arbitrator stated that Tri-C's defaults on the Earthwork and Interior Concrete Subcontracts—which were not bonded by the Surety and

---

[1] The Subcontract included an arbitration clause covering "any action or proceeding arising out of, under, in connection with, or in relation to this Subcontract Agreement, including, without limitation, controversies, claims, and/or disputes." (Dkt. 1-1 ¶¶ 11.1, 11.2).

[2] The Surety brought affirmative defenses that Direct Steel's claims were barred due to (1) damages being the result of the conduct, acts, or omissions of third parties; (2) prior material breach of the contract; (3) the doctrines of estoppel, acquiescence, and/or waiver; (4) failure to comply with and/or enforce the contract; (5) purported breaches occurring prior to the issuance of the Performance Bond; (6) the doctrine of unclean hands. (*See* Dkt. 1-7 ¶¶ 5–7, 9, 11–12).

occurred before the Performance Bond—impacted the Paving Subcontract and the non-commencement of work. Notably, the Arbitrator found that of the approximately 16 notices of default to Tri-C, the majority were in relation to the Earthwork and Interior Concrete Subcontracts, which were not bonded by the Surety. (*See id.* at ¶¶ 4–6, 9). The Arbitrator opined on the interrelated nature of the three subcontracts and the defaults that occurred under the prior two, non-bonded subcontracts.

> Tri-C would have this Arbitrator ignore the Earthwork Subcontract and the Interior Concrete Subcontract, and the status of Tri-C's work thereunder, and look solely to the Paving Subcontract. This, the Arbitrator cannot do. Clearly this was one, interrelated part of the Project, broken into three subcontracts to accommodate Tri-C because Tri-C could not bond more than $5 million work of work[.] . . . Tri-C would have the Arbitrator ignore the Earthwork scope on the one hand, but on the other argue that precursor work to the Paving Subcontract had not been completed, when it was contractually responsible for such precursor work. . . .
>
> Clearly Tri-C was deeply in default under the other two Subcontracts, which were not bonded by OK Surety. It was obvious that these defaults impacted the Paving Subcontract, to the degree that Tri-C never commenced performance under the Paving Subcontract. I cannot, as a matter of law, hold OK Surety liable for defaults that arose from Subcontracts that it did not bond.

(*Id.* at ¶¶ 10, 15C).

The Arbitrator also focused on Tri-C's material breach of failing to retain a Performance Bond within a reasonable time of February 2021:

> The Performance Bond was not provided until November 24, 2021, after Direct Steel had found out that Tri-C . . . had not submitted three bonds, for each Subcontract[.] . . .This breach was material; Direct Steel's claim under the bond was denied, in part because the 'purported defaults outlined in your correspondence and documents were known to Direct Steel prior to the issuance of the Bond on November 24, 2021,' and the Arbitrator sustains this denial herein. Direct Steel should have had the protection of a subcontractor performance bond, and it did and does not.

(*Id.* at ¶ 11).

Direct Steel now moves under 9 U.S.C. § 10 for an order vacating the portion of the award finding the Surety properly denied Direct Steel's claim under the Performance Bond. (Dkt. 1).

**LEGAL STANDARD**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Méré*, 51 F.3d 686, 688 (7th Cir. 1995). Confirmation of arbitration awards is "usually routine or summary." *Standard Sec. Life Ins. Co. of New York v. FCE Benefit Admin'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020) (citing *Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 691−92 (7th Cir. 2004)). In other words, this Court's review of an arbitration award is "extremely limited." *See Yasuda Fire & Marine Ins. Co. of Europe, Ltd v. Cont'l Cas. Co.*, 37 F.3d 345, 349 (7th Cir. 1994); *see also Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008); *Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006) ("It is tempting to think that courts are engaged in judicial review of arbitration awards under the [FAA], but they are not."). A court may not interfere with an arbitrator's findings of fact merely because it disagrees with them, otherwise the purpose of arbitration proceedings as speedy and cost-effective dispute resolution options would be undermined. *See United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (collective bargaining agreement context); *Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) ("Thinly veiled attempts to obtain appellate review of an arbitrator's decision . . . are not permitted under the FAA. Factual or legal errors by arbitrators—even clear or gross errors—do not authorize courts to annul awards.") (internal citations and quotations omitted); *Halim*, 516 F.3d at 56 (same).

Courts will only disrupt an arbitration award if the arbitrator "effectively dispenses his own brand of industrial justice because there is no possible interpretive route to the award." *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1026 (7th Cir. 2013) (cleaned up). But even then, the Court will not set aside an award even when "an arbitrator committed serious error or the

5

decision is incorrect or even whacky," *id.* at 1025–26, "so long as the arbitrator interpreted the parties' agreement *at all*," *Prostyakov v. Masco Corpation*, 513 F.3d 716, 723 (7th Cir. 2008). *See also Oxford Health Plans, LLC v. Sutter*, 569 U.S. 564, 569 (2013) (a court may vacate the arbitrator's decision "only in very unusual circumstances"); *Flexible Mfg.*, 86 F.3d at 100 ("The fact that an arbitrator makes a mistake, by erroneously rejecting a valid, or even a dispositive legal defense, does not provide grounds for vacating an award unless the arbitrator deliberately disregarded what she knew to be the law.").

Instead, the grounds for vacatur focus on "egregious departures from the parties' agreed-upon arbitration." *Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). In fact, a party seeking vacatur under § 10(a)(4) "bears a heavy burden." *Oxford Health Plans*, 569 U.S at 569. Specifically, the FAA permits a court to vacate an arbitration award in four narrow instances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)–(4).

**DISCUSSION**

As a preliminary matter, the Court notes that as it sits in diversity, the choice-of-law rule of the forum state, Illinois, applies. *See Travelers Prop. Cas. Co. of Am. v. Benchmark Ins. Co.*, 2024 WL 756945, at *8 (N.D. Ill. Feb. 23, 2024) (citing *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1184 (7th Cir. 1996)). Illinois choice-of-law principles dictate that forum law applies "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not

6

apply." *Paulsen v. Abbot Lab'ys*, 39 F.4th 473, 477 (7th Cir. 2022) (quoting *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020)). Neither party raises any conflicts between Illinois and Texas state or federal law on the issues before the Court and instead notes the law is substantially similar. (Dkt. 29 at 6 n.1; Dkt. 33 at 2 n.1). The Court applies the law of Illinois, the forum state.

## I. The Arbitration Award Is Rationally Derived from the Contract

Here, Direct Steel argues that the Arbitrator exceeded his powers in finding the Surety properly denied Direct Steel's claim on the Performance Bond. *See* 9 U.S.C. § 10(a)(4).

As outlined above, the Court may vacate an arbitrator's award only if the arbitrator exceeded his powers delegated to him by the parties such that there is no possible interpretive route to the award. *See Johnson Controls, Inc.*, 712 F.3d at 1026.; *see also Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194–95 (7th Cir. 1987) ("[T]he question for decision by a federal court asked to set aside an arbitration award . . . is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract.").

The arbitration clause in the Paving Subcontract was broad in scope, covering "any action or proceeding arising out of, under, in connection with, or in relation to this Subcontract Agreement, including, without limitation, controversies, claims, and/or disputes." (Dkt. 1-1 ¶¶ 11.1, 11.2). Additionally, the issues submitted to arbitration were whether Tri-C defaulted on the Paving Subcontract, potentially barring Direct Steel's claim on the Performance Bond, and if so, whether those defaults occurred before the Performance Bond was issued, thus existing outside of the Performance Bond's coverage. The Arbitrator evaluated evidence the parties submitted, including the relevant contracts and correspondence, and considered the Surety's affirmative defenses and counterclaims. The Arbitrator found that the Surety's denial of the claim was proper

7

as (1) Direct Steel and Tri-C did not accurately represent the status of the Project in order to achieve the November 2021 Performance Bond; (2) Tri-C had not performed any work under the Paving Subcontract at the time of their termination; and (3) Tri-C's defaults on the Earthwork and Interior Concrete Subcontracts—which were not bonded by the Surety and occurred before the Performance Bond—impacted the Paving Subcontract.

Based on these facts, the Arbitrator arrived at the award from rationally interpreting the Paving Subcontract and Performance Bond. In its extremely limited review, the Court cannot find that the Arbitrator's findings as to the Performance Bond claim took an "egregious departure[] from the parties' agreed-upon arbitration." *Hall St. Assocs.*, 552 U.S. at 586. The stringent standard upon which the Court's review is predicated compels this conclusion.

Direct Steel characterizes the Arbitrator's decision as one stemming from his "own sense of industrial justice" and constituting a "recission" of the Performance Bond. These characterizations miss the mark. Direct Steel takes issue with the Arbitrator's comment that Tri-C and Direct Steels' representations of the Project in an October 2021 "All is Right Letter" are "simply irreconcilable" with the status of the Project such that it was "almost inconceivable" the Performance Bond would be issued. This line does not rise to the level of an exceedance of powers under § 10(a)(4) and discounts the additional reasons the Arbitrator gave for finding the claim denial proper.

First, this case is not on par with those cited by the parties where an arbitrator employed their "own sense of industrial justice" in exceeding their powers. For example, in *Zeigler Company v. District 12, United Mine Workers of America*, an arbitrator interpreted a collective bargaining agreement to provide for additional overtime pay over Christmas vacation. 484 F. Supp. 445, 447 (C.D. Ill. 1980). The court found the arbitrator exceeded his authority because he sought

conflicting definitions of "vacation pay" that were not within the record and "add[ed]" a contract provision of additional overtime pay. *Id.* Similarly, the Fifth Circuit vacated an award where the arbitrator reinstated discharged employees in direct violation of the collective bargaining agreement's text. *Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 602 (5th Cir. 1989). In these two cases, which occurred in the labor context, "there was no possible interpretative route to the award" based on the text of the contract. *Johnson Controls, Inc.*, 712 F.3d at 1026. In contrast, the Arbitrator's interpretation of the Paving Subcontract and Performance Bond provisions was harmonious with the text of the contract and his factual findings. He simply found that the claim was not covered for the reasons given. If the phrase "own sense of industrial justice" was stretched as far as Direct Steel would like, an arbitrator would be precluded from giving any opinion on the pending matter when fashioning an award—clearly, a nonsensical result. After all, arbitrators, in some sense of the word, dispense justice.

Additionally, the Arbitrator did not "rescind" the Performance Bond—a legal term of art—but rather stated that the "denial . . . was correct," based on the rationales outlined, including that work had not commenced on the Paving Subcontract and the defaults on the Paving Subcontract were due to defaults on the non-bonded Earthwork and Interior Concrete Subcontracts. (*See* Dkt. 1-1 ¶ 15). These findings laid within the scope of interpreting the Paving Subcontract and Performance Bond and were in line with the issues the parties arbitrated, including the Surety's submitted affirmative defenses. The findings also could encompass the Surety's submitted affirmative defenses of prior material breach, unclean hands, or breaches occurring prior to issuance of the Performance Bond. Even if the Arbitrator misapprehended the law on these affirmative defenses, as Direct Steel argues, that is beside the point: "§ 10(a)(4) does not make

9

legal errors a ground on which a judge may refuse to enforce an award." *Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 902 (7th Cir. 2017).

In a similar vein, most of Direct Steel's arguments attempt to challenge the arbitrator's fact findings and legal conclusions. Yet errors in the "arbitrator's interpretation of law or findings of fact do not merit reversal." *Am. Zurich Ins. Co. v. Caton Park Nursing Home*, 2022 WL 1136579, at *3 (N.D. Ill. Apr. 18, 2022); *Oxford Health Plans*, 569 U.S. at 568–69. For example, the parties dispute the Arbitrator's findings that Tri-C's breaches upon which the default was based occurred prior to the issuance of the Performance Bond on November 24, 2021. Further, as the Arbitrator noted, Direct Steel argued throughout arbitration (and at present) that the subcontracts should be siloed, and that the defaults or impact of the Earthwork and Interior Concrete subcontracts should not affect the enforceability of the Performance Bond as to the Paving Subcontract. In any event, the Arbitrator's findings regarding the timing and existence of defaults are a factual interpretation or error by the Arbitrator. Again, bound to the stringent standard of review, the Court does not see how it was outside the Arbitrator's authority to analyze whether or why Tri-C was in default or did not begin performance on the Paving Subcontract in order to make a determination regarding the Surety's claim denial. As outlined above, those parties who challenge the factual basis for an award fail. *See, e.g.*, *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 278 (7th Cir. 1992).

II.     **The Surety's Motion to Confirm the Arbitration Award**

The Surety seeks confirmation of the award. (Dkt. 29). Within a year of the entry of an award, a party may seek to confirm it in the court so specified, and the court must do so unless the award has been vacated or modified under 9 U.S.C. § 10 or 9 U.S.C. § 11. *See* 9 U.S.C. § 9. "[I]f the district judge is satisfied that the arbitrators resolved the entire dispute and can figure out what that resolution is, [she] must confirm the award." *IDS Life Ins. Co. v. Royal Alliance Assocs.*, 266

10

F.3d 645, 650–51 (7th Cir. 2001). In the present action, Oklahoma Surety Company and Mid-Continent Casualty Company have sought confirmation of the award within one year of its entry on December 12, 2023. In light of the Court's ruling above, the award is confirmed.

## CONCLUSION

For the reasons explained above, the Court denies Direct Steel's petition to vacate the arbitration award in part [1] and confirms the award as to Respondents Oklahoma Surety Company and Mid-Continent Casualty Company.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: June 11, 2024